Juan C. FERNANDEZ–FAJARDO

v.

IMMIGRATION AND NATURALIZATION SERVICE.

Civil Action No. 01–266–D.

United States District Court, M.D. Louisiana.

Aug. 21, 2001.

Juan Fernandez Fajardo, Clinton, LA, pro se.

Tara Avery Hingle, United States Attorney's Office Middle District of Louisiana, Baton Rouge, LA, for Respondent.

## RULING ON PETITION FOR HABEAS CORPUS

BRADY, District Judge.

Petitioner, Juan C. Fernandez–Fajardo (Fernandez), presently incarcerated in the East Feliciana Parish Prison, located within this judicial district, brings this petition for writ of habeas corpus challenging the right of the United States Immigration and Naturalization Service (INS) to detain him in custody pending his deportation to Cuba. Jurisdiction is founded on 28 U.S.C. § 2241. This matter has been fully briefed, and there is no need for oral argument. For the reasons set forth, I find in favor of the Immigration and Naturalization Service and against the petitioner and DENY petitioner's request for writ of habeas corpus.

## FACTS

This matter is just one of hundreds of similar petitions that have arisen over the last 21 years as an outgrowth of the Mariel boatlifts of 1980. Petitioner is one of the nearly 125,000 undocumented Cuban nationals who arrived in the United States in 1980 from their native land in a series of boatlifts over several months, which boatlifts originated from the Cuban port of Mariel. INS officials detained petitioner and others similarly situated at the border and made a decision to exclude them from entering this country. Subsequent to this initial detention, Fernandez was granted immigration parole into the United States by the INS. Although this parole allowed the petitioner to be physically within the borders of the United States, he was still legally considered to be detained at the border and has never effected entry into this country. See *Lynch v. Cannatella*, 810 F.2d 1363, 1370 (5th Cir.1987).

After gaining such a "fictitious entry," which will be further discussed below, Fernandez was never a model guest. He was arrested at least 18 times between 1980 and 1989 and eventually was convicted of strong-arm robbery and imprisoned in Florida for two years. On December 5, 1990, he was ordered excluded and deported by an INS judge and was detained in INS custody until 1997. Because Cuba has long refused and still refuses to take back any of the excluded Mariel nationals, petitioner was never returned to Cuba. In March of 1997, he was paroled to a Florida halfway house where he failed to observe many of the rules under which he was paroled and eventually escaped, fleeing to New York State. There he was arrested three times and was convicted for attempted robbery in the second degree and sentenced to serve a three year sentence in April of 1998. In September of 1999, New York State released him to the INS, and he has been incarcerated in that agency's custody ever since. He has been considered for immigration parole annually since his 1999 incarceration in accordance with the Mariel Cuban Review Plan set forth at 8 C.F.R. § 212.12. However, the INS determined not to parole him because of his criminal record, drug abuse, and lack of credibility.

## PETITIONER'S ARGUMENT

Fernandez argues that since his removal to Cuba is not likely to be effected in the reasonably foreseeable future, his potential indefinite detention in INS custody constitutes impermissible punishment, violating his due process rights guaranteed by the Constitution. *Rodriguez v. Wilkinson*, 654 F.2d 1382 (10th Cir.1981). The Immigration and Naturalization Act, 8 U.S.C. § 1231(a)(1)(A) (1996), requires the Attorney General to remove an excludable alien within a reasonable period of 90 days. Fernandez asserts that beyond the 90 day period, aliens shall be subject to supervised release. 8 U.S.C. § 1231(a)(3). Fernandez further questions INS' denial of his immigration parole, asserting that the INS

was inconsistent in reviewing his situation, and he was reviewed without the presence of counsel only because his representative was late. Fernandez also complains about the parish jail conditions and requests a transfer to a federal correctional facility if his detention is sustained.

## RESPONDENT'S ARGUMENT

The INS argues that Fernandez's continued civil detention is authorized by the Statute and does not violate the Constitution. Congress has broad plenary powers on immigration matters, which are subject only to narrow judicial review. The INS states that Congress has charged the Attorney General with the administration and enforcement of this country's immigration laws, including the power to exclude, detain, and parole inadmissible aliens, and that the Attorney General's exercise of this discretional power is entitled to great deference.

The INS further argues that *Shaughnessy v. Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953), and *Gisbert v. Attorney General*, 988 F.2d 1437 (5th Cir.1993) are dispositive of this case. *Mezei* held that the Constitution does not afford an excludable alien any right against continued detention, even if such detention is indefinite while efforts are being made to arrange for the alien's actual departure. *Gisbert* held that "the continued detention of [excludable Mariel Cubans] is not punishment and does not constitute a violation of the aliens' rights to substantive due process." Therefore, as a lawfully excluded alien, Fernandez has no constitutional right to be free of detention and no statutory or constitutional liberty interest in being paroled from immigration detention. An excludable alien is entitled only to those due process rights as are provided by law. Fernandez has clearly been periodically reviewed in accordance with the parole review procedures for Mariel Cubans; therefore, he has not been denied

procedural due process. Immigration detention itself has never been considered punishment, but a necessary incident of enforcing the immigration laws. The Eighth Amendment does not apply to immigration detention. *Equan v. INS*, 844 F.2d 276, 279 (5th Cir.1988). Moreover, the periodic parole consideration provided by regulation for detained Mariel Cubans eliminates any concern that the detention might be excessive.

The INS also argues that because Fernandez has been convicted of an aggravated felony crime, the Attorney General is required under former 8 U.S.C. § 1226(e) (amended 1996) to take custody of him. If deportation of such alien found excludable cannot be immediate, the Attorney General may release him only if doing so will not endanger society. *Alvarez–Mendez v. Stock*, 941 F.2d 956 (9th Cir.1991). Even absent a conviction for an aggravated felony, Congress has authorized the Attorney General to continue to detain such an excluded alien until the deportation is practicable. *Gisbert*, 988 F.2d at 1447. Although 8 U.S.C. § 1182(d)(5)(A) permits the parole of excludable aliens from custody pending exclusion proceedings, such release is discretionary and conditional, not an alien's right. *Id.* at 1443. The Statute and the regulations for Mariel Cubans setting forth the minimum findings a panel must make in order to recommend release, 8 C.F.R. § 212.12(d)(2), neither require the Attorney General to release an alien, nor otherwise restrict his authority to deny immigration parole.

The INS points out that the amended provision governing the alien removal proceedings under the current Immigration and Naturalization Act, 8 U.S.C. § 1231 (amended 1996), does not apply to the present case. This is because Fernandez's exclusion proceeding was commenced on December 5, 1990, when the final exclusion

order was entered, before the new provision became effective on September 1, 1997. Even if the amendment were applicable, the INS argues that it adds no new entitlement to release, but does make clear that the Attorney General is authorized to detain removable aliens who cannot be repatriated. Furthermore, the 1996 amendment makes no change to the policy that treats those who have entered the country more favorably than the unadmitted (excludable) aliens and criminal aliens. Given that the amendment mandates the detention of even lawfully admitted aliens who have been convicted of aggravated felonies, excludable criminal aliens cannot claim greater statutory or constitutional right to be free of detention pending repatriation.

Finally, the INS submits that Fernandez has failed to allege that the Attorney General abused or exceeded his statutory discretion to detain or release unadmitted aliens. Congress has authorized the Attorney General, in his discretion, to grant parole to unadmitted aliens when he determines such parole to be in the public interest. Fernandez's criminal convictions constitute a proper reason to deny release under former 8 U.S.C. §§ 1182(d)(5)(A) or 1226(e) (amended 1996). The Attorney General's decisions detaining Fernandez and denying parole are only reviewed under the narrow "facially legitimate and bona fide reason" standard, set forth in *Kleindienst v. Mandel*, 408 U.S. 753, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972), and are reasonable decisions based on relevant considerations.

## DISCUSSION

A. Background Information on Terminology and Immigration Statute

1. Resident, deportable, excludable and inadmissible aliens

■ The legal rights of aliens in this country are, to a large extent, determined by a doctrine called "entry fiction." This doctrine allows the federal government to essentially estop the legal rights of newly arrived immigrants until a determination of their suitability for admission to the United States could be made. *Leng May Ma v. Barber*, 357 U.S. 185, 188, 78 S.Ct. 1072, 2 L.Ed.2d 1246 (1958); *Shaughnessy v. Mezei*, 345 U.S. 206, 215, 73 S.Ct. 625, 97 L.Ed. 956 (1953). Immigrants with the most legal protection are resident aliens who have lawfully entered the country, i.e. have been inspected and admitted by INS agents. Immigrants with the least amount of constitutional rights have been divided into two groups: deportable aliens and excludable aliens. *Landon v. Plasencia*, 459 U.S. 21, 24–26, 103 S.Ct. 321, 74 L.Ed.2d 21 (1982); *Gisbert v. U.S. Attorney Gen.*, 988 F.2d 1437 (5th Cir.1993). "Deportable aliens" are those who have gained entry to the country, whether by legal means or not, but whose right to remain was revoked through "deportation" proceedings. *Plasencia*, 459 U.S. at 25, 103 S.Ct. 321. "Excludable aliens" are those who were ineligible for "entry" in the first place. See 8 U.S.C. § 1182(a) (1994). Even though in reality these aliens were often granted parole and allowed to be physically present in the U.S., they are still considered outside the border, awaiting permission to enter the country. *Id.* See also *Gisbert*, at 1440. Under 8 U.S.C. § 1182(d)(5)(A), the Attorney General may in his discretion parole into the U.S. temporarily for urgent humanitarian reasons or significant public benefit any alien applying for admission, but such parole of such alien shall not be regarded as an admission to the country.

As amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA") and the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA") in 1996, the Immigration and Naturalization Act (the "INA") now refers to "inadmissible" aliens in the place of "excluda-

ble" aliens. The distinction turns on whether the alien has been "admitted" rather than whether the alien has gained "entry." Under the old scheme, aliens who entered "without inspection," that is, who crossed the border without being inspected by INS agents, fell into the category of "deportable" aliens because they had "entered" the country. 8 U.S.C. § 1251(a)(1)(B) (1994). Now those who enter without inspection, together with excludable aliens who are inspected but denied admission, are classified as "inadmissible" aliens because they were not officially admitted into the U.S. 8 U.S.C. § 1101(a)(13)(A) (1996). Under the new scheme, "deportable" aliens are those who were once resident aliens but have since been slated for deportation. 8 U.S.C. § 1227 (1996). The amended INA applies a uniform "removal proceeding" to both deportable and inadmissible aliens. 8 U.S.C. § 1231 (1996).

■■■ These classifications have constitutional significance. Under the "entry fiction," excludable aliens are legally considered to be detained at the border and are thus beyond the reach of the Constitution. As such, "the Due Process Clause affords an excludable alien no procedural protection beyond the procedure explicitly authorized by Congress, nor any 'substantive right to be free from immigration detention.'" *Phan v. Reno*, 56 F.Supp.2d 1149, 1154 (W.D.Wash.1999) (quoting *Plasencia*, 459 U.S. at 32, 103 S.Ct. 321). Resident aliens, by contrast, have significantly more rights than excludable aliens, for "[o]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly." *Plasencia*, 459 U.S. at 32, 103 S.Ct. 321. Generally, resident aliens are given protections of substantive and procedural due process that excludable aliens are not. *Id.* at 32–33, 103 S.Ct. 321. As to deportable aliens, courts disagree on the extent of rights

belonging to deportable aliens. Some courts have held that these aliens retain all of the rights that they enjoyed as resident aliens until they are physically removed from the country, while others feel that once an order of deportation is finalized, the rights that these aliens enjoy as residents disappear. The Supreme Court, in *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), gives some guidance on the permissible period of post-removal detention of deportable aliens.

Fernandez is an excludable alien under the old scheme, and an inadmissible alien under the 1996 amendment. He was inspected by an INS agent in May 1980 together with other Mariel Cubans, and was paroled into the U.S. pending the determination of his admissibility. He was subsequently ordered to be excluded by an immigration judge in September 1990. According to "entry fiction," Fernandez has never entered, or been admitted to, the U.S. He is regarded as having been stopped at the border all the time.

2. The Statutory Provisions on Detention and Removal of Excludable Aliens and the Case Law Interpretations

Through AEDPA and IIRIRA, Congress substantially amended the INA in 1996 with regard to the detention and removal of aliens who are deemed deportable or inadmissible.

Before 1996, the INA explicitly required the Attorney General to take into custody any excludable alien who is convicted of an aggravated felony, pending a determination of excludability. 8 U.S.C. § 1226(e)(1) (1994). The Attorney General may release such alien only after concluding that "the alien will not pose a danger to the safety of other persons or to property." 8 U.S.C. § 1226(e)(3) (1994). The INA did not expressly grant the authority to detain indefinitely those excluded aliens who have not

been convicted of aggravated felonies but who cannot be immediately deported. However, most courts addressing the issue of indefinite detention of Mariel Cubans have concluded that Congress implicitly authorized the Attorney General to order such detention. The Fifth Circuit states that "the INA authorizes the Attorney General to continue to detain [Mariel Cubans], whether or not they have been convicted of aggravated felonies, until the United States is able to deport them." *Gisbert*, 988 F.2d at 1447. Most other circuit courts reach the same conclusion in response to the constitutional challenges brought by the detained Mariel Cubans. See *Palma v. Verdeyen*, 676 F.2d 100 (4th Cir.1982); Garcia–Mir v. Meese, 788 F.2d 1446 (11th Cir.1986); *Barrera–Echavarria v. Rison*, 44 F.3d 1441 (9th Cir.1995); *Guzman v. Tippy*, 130 F.3d 64 (2n Cir. 1997); and *Carrera–Valdez v. Perryman*, 211 F.3d 1046 (7th Cir.2000). But see *Rosales–Garcia v. Holland*, 238 F.3d 704 (6th Cir.2001) (holding, over a strong dissent, that the indefinite nature of detention violates the Fifth Amendment); and *Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382 (10th Cir.1981) (holding that indefinite detention is not a permissible alternative to exclusion). In 1987, the Justice Department enacted the Cuban Review Plan ("CRP"), 8 C.F.R. § 212.12. The CRP is a special program that expands the consideration of immigration parole with regard to Mariel Cubans. Under this plan, detained Mariel Cubans are granted an annual hearing by INS. 8 C.F.R. § 212.12(g)(2). The detainees must be found to no longer pose a public threat in order to be released from custody. § 212.12(d)(2). Courts have held that in parole review hearings, detainees have no right to counsel and have no right to review the evidence that serves as the basis of the INS' decision to deny parole. *In re Mariel Cuban*, 822 F.Supp. 192, 196–197 (M.D.Pa.1993).

In 1996, Congress amended the INA and introduced a uniform detention, release and removal proceeding applicable to all aliens deemed deportable or inadmissible. 8 U.S.C. § 1231(a). Under the new scheme, the Attorney General shall remove an alien ordered removed from the U.S. within a period of 90 days (the "removal period"). § 1231(a)(1)(A). During such period, the Attorney General shall detain the alien. § 1231(a)(2). If the alien does not leave or is not removed within the removal period, the alien, pending removal, shall be subject to supervision under regulations prescribed by the Attorney General. § 1231(a)(3). A special provision authorizes further detention if the INS fails to remove the alien during the removal period. It says:

"An alien ordered removed [1] who is inadmissible ... [or][2] removable [as a result of violations of status requirements or entry conditions, violations of criminal law, or reasons of security or foreign policy] or [3] who has been determined by the Attorney General to be a risk to the community or unlikely to comply with the order of removal, may be detained beyond the removal period and, if released, shall be subject to [certain] terms of supervision. ...." § 1231(a)(6).

The statute applies to both inadmissible (excludable) and deportable aliens. Until the Supreme Court's decision in *Zadvydas*, courts were sharply split on whether indefinite detention of deportable aliens is permissible under § 1231(a)(6). The majority of courts held that the language of the statute permits indefinite detention of aliens, but such detention is a violation of the alien's right of due process and is therefore unconstitutional. A minority of courts held that the language of the statute permits the indefinite detention of aliens and that prolonged detention under the statute is both lawful and constitution-

al. Finally, two courts have invoked the doctrine of constitutional avoidance and concluded that the language of § 1231(a)(6) does not permit indefinite detention at all. See generally, Daniel R. Dinger, When We Cannot Deport, Is It Fair to Detain? 00 B.Y.U.L.Rev. 1551.

### 3. *Zadvydas v. Davis*

The Supreme Court made an attempt in *Zadvydas v. Davis*, 533 U.S. 678, 121 S.Ct. 2491, 150 L.Ed.2d 653 (2001), to reconcile the conflicting positions taken by the lower courts. In that case, resident aliens who had been ordered removed and who were held in custody by INS beyond the 90 day removal period, due to the government's inability to remove them, brought separate habeas petitions seeking release. The Court held that 8 U.S.C. § 1231(a)(6) does not authorize detention of an alien, pending removal, indefinitely. The Court further held that following issuance of a final order of removal there is a "presumptively reasonable" period of six months during which the INS may continue to detain an alien it is seeking to remove. *Zadvydas*, 121 S.Ct. at 2505. "After this 6 month period, once the alien provides good reason to believe that there is no significant likelihood of removal in the reasonably foreseeable future, the Government must respond with evidence sufficient to rebut that showing. .... This 6 month period presumption .... does not mean that every alien not removed must be released after six months. To the contrary, an alien may be held in confinement until it has been determined that there is no significant likelihood of removal in the 'reasonably foreseeable future.'" *Id.*

In reaching such a conclusion, the Court reasons that a statute permitting indefinite detention would raise serious constitutional questions. Freedom from imprisonment lies at the heart of the liberty protected by the Due Process Clause. Government detention violates the Due Process Clause unless it is ordered in a criminal proceeding with adequate procedural safeguards. Here, the Government offers two justifications for the potentially indefinite civil detention: preventing flight and protecting the community from dangerous aliens. However, the first justification-preventing flight-is weak or nonexistent where removal seems a remote possibility. Preventive detention based on aliens' dangerousness has been upheld only when limited to specially dangerous individuals and subject to strong procedural protections. The civil confinement here is potentially permanent, but the sole procedural protections are found in administrative proceedings, where the alien bears the burden of proving he is not dangerous, without (according to the Government) significant later judicial review. The Constitution may well preclude granting an administrative body unreviewable authority to make determinations implicating fundamental rights. *Id.* at 2498–2500.

However, the Court seems to explicitly limit its holding to deportable aliens, i.e., those who were admitted to the U.S. but subsequently ordered removed. *Id.* at 2500–2501. In response to the Government's reliance on the cases endorsing the indefinite detention of excludable aliens, the Court counters that aliens who have not yet gained initial admission to this country would present a very different question. The Court states that "[i]t is well established that certain constitutional protections available to persons inside the United States are unavailable to aliens outside of our geographic borders." *Id.* at 2500. It further emphasizes that "the distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law.... [A]lien 'paroled' into the United States pending admissibility had not effected an 'entry.'" *Id.* This language seems to imply that *Zadvydas*

only places a "reasonable time" limitation on the post-removal-period detention of aliens who have indeed entered the country; and the Court would probably treat the excluded aliens differently.

## B. Analysis

### 1. Distinguishing *Zadvydas*

 Although *Zadvydas* imposes a limitation on the immigration detention of aliens by interpreting § 1231, it is not applicable to the present case. First, INS' argument that § 1231 does not apply to pre-IIRIRA exclusion cases has merit. As part of IIRIRA, § 1231 was enacted in 1996. According to IIRIRA, its permanent provisions apply only to removal proceedings commenced after April 1, 1997, IIRIRA's effective date. See IIRIRA § 309(c)(1). Therefore, I must apply former § 1226(e) to the instant case because Fernandez was subject to an order of exclusion in 1990, prior to the Act's effective date. See also *Rosales*, 238 F.3d at 715; and *Carrera*, 211 F.3d at 1048.

Second, *Zadvydas* addresses only the post-removal-period detention of resident aliens who are later declared removable. The Court explicitly distinguishes the case with the situation, such as here, concerning the rights of excludable aliens. *Zadvydas*, 121 S.Ct. at 2500–01. To apply the *Zadvydas* limitation to excludable aliens, I must reexamine the "entry fiction" doctrine that treats an excludable alien as detained at the border despite his physical presence in the country, and therefore not entitled to the constitutional protections provided to those within the territorial jurisdiction of the U.S. *Mezei*, 345 U.S. 206, 73 S.Ct. 625, 97 L.Ed. 956 (1953). The Court's reasoning in *Zadvydas* does not move toward that direction.

### 2. Majority Decisions: Indefinite Detention Constitutional

If former 8 U.S.C. § 1226(e) applies, it has been held by most circuit courts to permit the indefinite detention of excludable aliens convicted of aggravated felonies. Under former § 1226(e), an excludable alien who has committed an aggravated felony must be taken into custody, and the Attorney General "shall not release such felon from custody" unless the Attorney General determines not only (1) that the alien's native land has denied or unduly delayed acceptance of the return, but also (2) "that the alien will not pose a danger to the safety of other persons or property" if released. Under 8 U.S.C. § 1101(a)(43), "aggravated felony" includes a crime of violence for which the term of imprisonment is at least one year. Fernandez is an aggravated felon because he has been convicted of strong-arm robbery and attempted robbery at the second degree, all carrying a minimum sentence of one-year imprisonment. Here, Fernandez satisfies condition (1), but the INS has determined that he does not satisfy condition (2). Therefore, he is entitled to a writ of habeas corpus only if the second condition violates the Constitution.

 The majority of the appellate courts, however, have held that the indefinite (pro-longed) detention of excludable Mariel Cubans, including those with criminal conviction, does not violate the Constitution. See *Gisbert*, 988 F.2d 1437 (5th Cir.1993); *Guzman*, 130 F.3d 64 (2n Cir. 1997); *Palma*, 676 F.2d 100 (4th Cir.1982); *Carrera*, 211 F.3d 1046 (7th Cir.2000); *Barrera*, 44 F.3d 1441 (9th Cir.1995); and *Garcia*, 788 F.2d 1446 (11th Cir.1986). See also *Ngo*, 192 F.3d 390 (3rd Cir.1999) (excludable aliens may be detained for lengthy period without violating due process clause when removal is beyond the control of INS, provided that appropriate

provisions for parole are available). These cases generally provided three justifications for the rule. First, Congress has broad plenary power on the control of immigration. The "power of exclusion of foreigners [is] an incident of sovereignty belonging to the government of the United States," and "cannot be granted away or restrained." The *Chinese Exclusion Case*, 130 U.S. 581, 609, 9 S.Ct. 623, 32 L.Ed. 1068 (1889). Immigrants who seek admission into the U.S. do so without any constitutional rights, and therefore, any request for admission granted to an excluded alien is a privilege, not a right. *Knauff v. Shaughnessy*, 338 U.S. 537, 542, 70 S.Ct. 309, 94 L.Ed. 317 (1950). The government has been free to grant the requests of excludable aliens in any fashion it desires. *Id.* at 541, 70 S.Ct. 309. Courts thus defer to the inherent sovereign power of the executive and legislative branches on immigration matters and refuse to intervene on the alien's behalf.

■ Second, the entry fiction doctrine establishes that an excludable alien has no constitutional right to immigration parole and, therefore, no right to be free from detention pending his exclusion. In *Shaughnessy v. Mezei*, the excluded alien had been a permanent resident but lost this status when he left the country for nineteen months in Hungary, and was subsequently detained on Ellis Island when his reentry was denied on national security grounds. *Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 97 L.Ed. 956 (1953). The Court held that an excludable alien may be detained indefinitely when his country of origin will not accept his return. This is so because the Court has long distinguished between aliens who have entered the U.S. and aliens who have not yet entered this country. As stated above, the entry fiction treats an excludable alien as if he remains detained at the border and not present on U.S. territory. The constitutional protection does not extend to those who are merely "on the threshold of initial entry." *Id.* at 212, 73 S.Ct. 625. In terms of substantive due process, although an excludable alien may have a Fifth Amendment liberty interest in not being physically abused, he simply has no constitutional right to be free from the detention that is within the Attorney General's absolute right to effect his exclusion. In terms of procedural due process, "[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." *Id.* See also *Gisbert*, 988 F.2d at 1441–44.

Third, the detention of an excludable alien is arguably not indefinite when parole review is available and properly followed. In *Barrera*, 44 F.3d 1441, the court concluded that the custody of a Mariel Cuban was not indefinite, pointing to the existence of the detailed Cuban Review Plan providing for periodic review of the alien's eligibility for parole. *Id.* at 1450. Under CRP, an excluded alien is reviewed annually to determine if he meets established criteria for granting parole. 8 C.F.R. § 212.12. At his annual review, the alien can be assisted by a representative and has the opportunity to present oral and written information in support of his release. Id. § 212.12(d)(4). Factors considered in these reviews include participation in educational and vocational programs, ties to the community, criminal and disciplinary records, psychological evaluation, and other information concerning the alien's fitness to enter American society. Id. § 212.12(d)(3). Other circuit courts have reached a similar result. See *Gisbert*, 988 F.2d at 1442–44 ("continued INS detention of [a Mariel Cuban] .... does not constitute a violation of the aliens' rights to substantive due process," and noting the existence of regulations for a grant of parole); and *Guzman*, 130 F.3d at 66 (excluded alien's rights determined by procedures established by Congress, and

noting existence of regulations allowing parole).

In an excludable alien case, the Third Circuit held that due process is satisfied only if parole review is based on an individualized analysis of the alien's eligibility for parole and present danger to society. *Ngo*, 192 F.3d at 398–99. In that case, the court found that INS conducted superficial reviews, repeatedly denying parole to an excludable criminal alien who had been detained in a prison setting for more than four years after being found by state authorities to be suitable for release into the community. INS relied on no more than a reading of the file that listed ten-year old convictions, ignoring plenty of other contradictory evidence. *Id.* at 388. The court states that "[w]hen detention is prolonged, special care must be exercised so that the confinement does not continue beyond the time when the original justifications for custody are no longer tenable." *Id.* "Measures must be taken to assess the risk of flight and danger to the community on a current basis." *Id.*

3. Conclusion

 Under the Fifth Circuit precedent in *Gisbert,* and the decisions from the majority of other appellate courts, Fernandez's constitutional challenge to his detention is not viable. It is well established that the INA authorizes the continued detention of excludable aliens who are only entitled to due process protection as provided by Congress. Also, Fernandez does not contend that the parole review procedures were not followed here. He argues that INS failed to render a review decision in his favor. However, the record does not show that INS only conducted a superficial review. It based its decision on an interview with Fernandez, and the information on his recent parole experience. The evidence in the record is insufficient to contradict this decision. Thus, Fernandez's

petition for writ of habeas corpus is DENIED.

The request of the petitioner for a transfer or for a change of his prison conditions cannot be the subject of a petition for a writ of habeas corpus and is therefore DENIED without prejudice.

Baton Rouge, Louisiana, this 21st day of August, 2001.